**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MANCHESTER UNITED FOOTBALL CLUB LIMITED, TOTTENHAM HOTSPUR LIMITED, and THE LIVERPOOL FOOTBALL CLUB AND ATHLETIC GROUNDS LIMITED, | Case No. 23-cv-15822 |
| Plaintiffs, | |
| v. | |
| THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," | |
| Defendants. | |

**COMPLAINT**

Plaintiffs Manchester United Football Club Limited ("MUFC"), Tottenham Hotspur Limited ("THFC"), and The Liverpool Football Club and Athletic Grounds Limited ("LFC") (collectively, "Plaintiffs") hereby bring the present action against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto (collectively, "Defendants") and allege as follows:

## I. JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at

least the fully interactive, e-commerce stores[1] operating under the seller aliases identified in Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiffs' respective trademarks to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     This action has been filed by Plaintiffs to combat e-commerce store operators who trade upon Plaintiffs' reputations and goodwill by offering for sale and/or selling unauthorized and unlicensed products, including apparel and other products using infringing and counterfeit versions of Plaintiffs' federally registered trademarks (the "Counterfeit Products"). Plaintiffs MUFC, THFC, and LFC are all professional football clubs participating in the English Premier League ("EPL" or "Premier League") which is the top level of the English football league system. In collaboration with Premier League, Plaintiffs have established programs of trademark protection and enforcement. Premier League and Plaintiffs regularly investigate suspicious e-commerce stores and enforce their trademark rights to prevent the sale of Counterfeit Products.

4.     Defendants create e-commerce stores operating under one or more Seller Aliases that are advertising, offering for sale, and selling Counterfeit Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share unique identifiers, establishing a logical relationship between them and that Defendants' counterfeiting operation arises out of the

---

[1] The e-commerce store URLs are listed on Schedule A hereto under the Online Marketplaces.

same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid and mitigate liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiffs are forced to file this action to combat Defendants' counterfeiting of their registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

### III. THE PARTIES

**Plaintiffs**

**Plaintiff Manchester United Football Club Limited**

5.      Plaintiff Manchester United Football Club Limited ("MUFC") is a professional football club that competes in the Premier League with its principal place of business in Old Trafford, Greater Manchester, England.

6.      MUFC is, in part, engaged in the business of producing, manufacturing, and distributing throughout the world, including within this judicial district, premium athletic apparel, accessories, and other products under federally registered trademarks. For generations, the MUFC brand has been one of the undisputed world leaders in the field of apparel and accessories, including those which prominently display the famous, internationally recognized, and federally registered trademarks of MUFC (collectively, the "MUFC Products").

7.      MUFC Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. Among the purchasing public, genuine MUFC Products are instantly recognizable as such. In the United States and around the world, MUFC's brand has come to symbolize high quality and MUFC Products are among the most

recognizable in the world. In July 2012, MUFC was ranked first by Forbes magazine in its list of the ten most valuable sports team brands, valuing the MUFC brand at $2.23 billion. MUFC Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as DICK's Sporting Goods and other sporting goods stores, and through the official manutd.com website.

8.     MUFC incorporates a variety of distinctive marks in the design of its various MUFC Products. As a result of its long-standing use, MUFC owns common law trademark rights in its MUFC trademarks. MUFC has also registered its trademarks with the United States Patent and Trademark Office. MUFC Products typically include at least one of MUFC's registered trademarks. Often several MUFC marks are displayed on a single MUFC Product. MUFC uses its trademarks in connection with the marketing of its MUFC Products, including the following registered marks which are collectively referred to as the "MUFC Trademarks."

| Registration No. | Trademark |
|---|---|
| 2,556,390 |  |
| 2,864,029 5,029,049 | MANCHESTER UNITED |
| 3,214,435 |  |
| 3,369,663 | **MU** |

4

| Registration No. | Trademark |
|---|---|
| 4,214,045 |  |
| 4,797,705 | MUFC |
| 4,843,297 |  |
| 4,929,771 |  |
| 5,303,910 |  |
| 5,663,479 |  |
| 5,809,198 |  |

| Registration No. | Trademark |
|---|---|
| 5,847,510<br>5,963,828 | MAN UTD |
| 5,887,591 |  |
| 5,899,493 |  |
| 5,905,684 | MAN UNITED |
| 5,923,245 |  |
| 6,104,053 | I LOVE UNITED |

9.      The above registrations for the MUFC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  The MUFC Trademarks have been used exclusively and continuously by MUFC and have never been abandoned.  The registrations for the MUFC Trademarks constitute *prima facie* evidence of their validity and of MUFC's exclusive right to use the MUFC Trademarks pursuant to 15 U.S.C. § 1057(b).  Attached hereto as **Exhibit 1** are true and correct copies of the United States Registration Certificates for the MUFC Trademarks included in the above table.

10.     The MUFC Trademarks are exclusive to MUFC and are displayed extensively on MUFC Products and in MUFC's marketing and promotional materials.  Typically, one or more

of the MUFC Trademarks are included on MUFC Products. MUFC Products have long been among the most popular of their kind in the world and have been extensively promoted and advertised at great expense. In fact, MUFC has expended millions of dollars annually in advertising, promoting, and marketing featuring the MUFC Trademarks. MUFC Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs and renown as desired items. Because of these and other factors, the MUFC name and the MUFC Trademarks have become famous throughout the United States.

11.     The MUFC Trademarks are distinctive when applied to the MUFC Products, signifying to the purchaser that the products come from MUFC and are manufactured to MUFC's quality standards. Whether MUFC manufactures the products itself or licenses others to do so, MUFC has ensured that products bearing its trademarks are manufactured to the highest quality standards. The MUFC Trademarks have achieved tremendous fame and recognition, which has only added to the inherent distinctiveness of the marks. As such, the goodwill associated with the MUFC Trademarks is of incalculable and inestimable value to MUFC.

12.     For many years, MUFC Products have been promoted and sold at the official manutd.com website. Sales of MUFC Products via the manutd.com website are significant. The manutd.com website features proprietary content, images, and designs exclusive to MUFC.

13.     MUFC's innovative marketing and product designs have enabled MUFC to achieve widespread recognition and fame and have made the MUFC Trademarks some of the most well-known marks in the industry. The widespread fame, outstanding reputation, and significant goodwill associated with the MUFC brand have made the MUFC Trademarks valuable assets of MUFC.

14.     MUFC has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the MUFC Trademarks. As a result, products bearing the

7

MUFC Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from MUFC. MUFC is a multi-million-dollar operation and MUFC Products have become among the most popular of their kind in the world.

**Plaintiff Tottenham Hotspur Limited**

15. Plaintiff Tottenham Hotspur Limited ("THFC") is a professional football club based in Tottenham, England, that competes in the Premier League.

16. THFC is, in part, engaged in the business of producing, manufacturing, and distributing throughout the world, including within this judicial district, premium athletic apparel, accessories, and other products under federally registered trademarks. For generations, the THFC brand has been one of the undisputed leaders in the field of apparel and accessories, including those which prominently display the famous, internationally recognized, and federally registered trademarks of THFC (collectively, the "THFC Products").

17. THFC Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. In 2019, Tottenham Hotspur Football Club was ranked by Forbes magazine as the world's ninth-most-valuable football club, valued at $1.624 billion. Among the purchasing public, genuine THFC Products are instantly recognizable as such. In the United States and around the world, the THFC brand has come to symbolize high quality and THFC Products are among the most recognizable apparel and accessories in the world.

18. THFC Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as DICK's Sporting Goods and other sporting goods stores, and through the official tottenhamhotspur.com website.

19.     THFC incorporates a variety of distinctive marks in the design of its various THFC Products.  As a result of its long-standing use, THFC owns common law trademark rights in its THFC trademarks.  THFC has also registered its trademarks with the United States Patent and Trademark Office.  THFC Products typically include at least one of THFC's registered trademarks.  Often, several THFC marks are displayed on a single THFC Product.  THFC uses its trademarks in connection with the marketing of its THFC Products, including the following registered marks which are collectively referred to as the "THFC Trademarks."

| Registration No. | Trademark |
|---|---|
| 2,952,962 |  |
| 2,952,963 |  |
| 2,980,045 5,005,441 | TOTTENHAM HOTSPUR |

| Registration No. | Trademark |
|---|---|
| 4,903,214 |  |
| 4,903,251 |  |
| 4,903,257 |  |
| 4,929,549 |  |
| 5,005,438 | HOTSPUR |
| 5,139,349 | COYS |

| Registration No. | Trademark |
|---|---|
| 5,664,308 |  |

20.     The above registrations for the THFC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  The THFC Trademarks have been used exclusively and continuously by THFC and have never been abandoned.  The registrations for the THFC Trademarks constitute *prima facie* evidence of their validity and of THFC's exclusive right to use the THFC Trademarks pursuant to 15 U.S.C. § 1057(b).  Attached hereto as **Exhibit 2** are true and correct copies of the United States Registration Certificates for the THFC Trademarks included in the above table.

21.     The THFC Trademarks are exclusive to THFC and are displayed extensively on THFC Products and in THFC's marketing and promotional materials.  Typically, one or more of the THFC Trademarks are included on THFC Products.  THFC Products have long been among the most popular of their kind in the world and have been extensively promoted and advertised at great expense.  In fact, THFC has expended millions of dollars annually in advertising, promoting, and marketing featuring the THFC Trademarks.  THFC Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs and renown as desired items.  Because of these and other factors, the THFC name and the THFC Trademarks have become famous throughout the United States.

22.     The THFC Trademarks are distinctive when applied to the THFC Products, signifying to the purchaser that the products come from THFC and are manufactured to THFC's quality standards.  Whether THFC manufactures the products itself or licenses others to do so, THFC has ensured that products bearing its trademarks are manufactured to the highest quality standards.  The THFC Trademarks have achieved tremendous fame and recognition, which has only added to the inherent distinctiveness of the marks.  As such, the goodwill associated with the THFC Trademarks is of incalculable and inestimable value to THFC.

23.     For many years, THFC Products have been promoted and sold at the official tottenhamhotspur.com website.  Sales of THFC Products via the tottenhamhotspur.com website are significant.  The tottenhamhotspur.com website features proprietary content, images, and designs exclusive to THFC.

24.     THFC's innovative marketing and product designs have enabled THFC to achieve widespread recognition and fame and have made the THFC Trademarks some of the most well-known marks in the industry.  The widespread fame, outstanding reputation, and significant goodwill associated with the THFC brand have made the THFC Trademarks valuable assets of THFC.

25.     THFC has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the THFC Trademarks.  As a result, products bearing the THFC Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from THFC.  THFC is a multi-million-dollar operation and THFC Products have become among the most popular of their kind in the world.

**Plaintiff The Liverpool Football Club and Athletic Grounds Limited**

26. Plaintiff The Liverpool Football Club and Athletic Grounds Limited ("LFC") is a professional football club based in Liverpool, England, that competes in the Premier League.

27. LFC is, in part, engaged in the business of producing, manufacturing, and distributing throughout the world, including within this judicial district, premium athletic apparel, accessories, and other products under federally registered trademarks. For generations, LFC has been one of the undisputed leaders in the field of apparel and accessories, including those which prominently display the famous, internationally recognized, and federally registered trademarks of LFC (collectively, the "LFC Products").

28. LFC Products have become enormously popular and even iconic, driven by the brand's arduous quality standards and innovative design. In 2019, Liverpool Football Club was ranked by Forbes magazine as the world's eighth-most-valuable football club, valued at $2.183 billion. Among the purchasing public, genuine LFC Products are instantly recognizable as such. In the United States and around the world, the LFC brand has come to symbolize high quality and LFC Products are among the most recognizable apparel and accessories in the world.

29. LFC Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as DICK's Sporting Goods and other sporting goods stores, and through the official liverpoolfc.com website.

30. LFC incorporates a variety of distinctive marks in the design of its various LFC Products. As a result of its long-standing use, LFC owns common law trademark rights in its LFC trademarks. LFC has also registered its trademarks with the United States Patent and Trademark Office. LFC Products typically include at least one of LFC's registered trademarks. Often, several LFC marks are displayed on a single LFC Product. LFC uses its trademarks in

connection with the marketing of its LFC Products, including the following marks which are collectively referred to as the "LFC Trademarks."

| Registration No. | Trademark |
|---|---|
| 3,307,401 |  |
| 3,867,538 |  |
| 4,169,888 |  |
| 5,089,345 | THE NORMAL ONE |

| Registration No. | Trademark |
|---|---|
| 6,742,770 |  |
| 6,749,353 | YOU'LL NEVER WALK ALONE |
| 6,756,305 | LFC |
| 6,756,306 |  |
| 6,762,837 | LIVERPOOL FC |
| 6,805,698 | YNWA |
| 6,816,910 | LIVERPOOL FOOTBALL CLUB |

31.     The above registrations for the LFC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  The LFC Trademarks have been used exclusively and continuously by LFC and have never been abandoned.  The registrations for the LFC Trademarks constitute *prima facie* evidence of their validity and of LFC's exclusive right to use the LFC Trademarks pursuant to 15 U.S.C. § 1057(b).  Attached hereto as **Exhibit 3** are true and correct copies of the United States Registration Certificates for the LFC Trademarks included in the above table.

32.     The LFC Trademarks are exclusive to LFC and are displayed extensively on LFC Products and in LFC's marketing and promotional materials.  Typically, one or more of the LFC Trademarks are included on LFC Products.  LFC Products have long been among the most popular of their kind in the world and have been extensively promoted and advertised at great expense.  In fact, LFC has expended millions of dollars annually in advertising, promoting, and marketing featuring the LFC Trademarks.  LFC Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs and renown as desired items.  Because of these and other factors, the LFC name and the LFC Trademarks have become famous throughout the United States.

33.     The LFC Trademarks are distinctive when applied to the LFC Products, signifying to the purchaser that the products come from LFC and are manufactured to LFC's quality standards.  Whether LFC manufactures the products itself or licenses others to do so, LFC has ensured that products bearing its trademarks are manufactured to the highest quality standards.  The LFC Trademarks have achieved tremendous fame and recognition, which has only added to the inherent distinctiveness of the marks.  As such, the goodwill associated with the LFC Trademarks is of incalculable and inestimable value to LFC.

34.     For many years, LFC Products have been promoted and sold at the official liverpoolfc.com website.  Sales of LFC Products via the liverpoolfc.com website are significant.  The liverpoolfc.com website features proprietary content, images, and designs exclusive to LFC.

35.     LFC's innovative marketing and product designs have enabled LFC to achieve widespread recognition and fame and have made the LFC Trademarks some of the most well-known marks in the industry.  The widespread fame, outstanding reputation, and significant goodwill associated with the LFC brand have made the LFC Trademarks valuable assets of LFC.

36. LFC has expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the LFC Trademarks. As a result, products bearing the LFC Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from LFC. LFC is a multi-million-dollar operation and LFC Products have become among the most popular of their kind in the world.

37. The MUFC Trademarks, THFC Trademarks, and LFC Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

38. The MUFC Products, THFC Products, and LFC Products are collectively referred to herein as "Plaintiffs' Products."

**The Defendants**

39. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiffs. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax trademark enforcement systems, or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

40. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

41. The success of the Plaintiffs' brands has resulted in significant counterfeiting of their trademarks. In recent years, Plaintiffs have identified many fully interactive, e-commerce stores offering counterfeit Plaintiffs' Products on online marketplace platforms such as Amazon, eBay, AliExpress, Alibaba, Wish.com, Walmart, Etsy, Temu, and DHgate, including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a U.S. Customs and Border Protection (CBP) report, in 2021, CBP made over 27,000 seizures of goods with intellectual property rights (IPR) violations totaling over $3.3 billion, an increase of $2.0 billion from 2020. *Intellectual Property Rights Seizure Statistics, Fiscal Year 2021*, U.S. Customs and Border Protection (**Exhibit 4**). Of the 27,000 in total IPR seizures, over 24,000 came through international mail and express courier services (as opposed to containers), most of which originated from China and Hong Kong. *Id.*

42. Third party service providers like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 5**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also*, report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020) attached as **Exhibit 6** and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by preemptively establishing multiple virtual

store-fronts. **Exhibit 6** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 6** at p. 39. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 5** at 186-187.

43. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents of Illinois.

44. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Plaintiffs have not licensed or authorized Defendants to use any of the Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

45. Many Defendants also deceive unknowing consumers by using Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their e-commerce stores to attract various search engines crawling the Internet looking for websites relevant to

consumer searches for Plaintiffs' Products. Other e-commerce stores operating under Seller Aliases omit using Plaintiffs' Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiffs' Products.

46. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

47. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

48. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features, such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

49. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

50. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation in spite of Plaintiffs' enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to Plaintiffs. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

51. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiffs, have jointly and severally, knowingly and willfully used and continue to use Plaintiffs' Trademarks in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet.

52. Defendants' unauthorized use of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States, including Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

53.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

54.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  Plaintiffs' Trademarks are highly distinctive marks.  Consumers have come to expect the highest quality from Plaintiffs' Products offered, sold, or marketed under Plaintiffs' Trademarks.

55.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiffs' Trademarks without Plaintiffs' permission.

56.     Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks. Plaintiffs' United States Registrations for the Plaintiffs' Trademarks (**Exhibits 1-3**) are in full force and effect.  On information and belief, Defendants have knowledge of Plaintiffs' rights in Plaintiffs' Trademarks and are willfully infringing and intentionally using counterfeits of Plaintiffs' Trademarks.  Defendants' willful, intentional, and unauthorized use of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

57.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

58.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' Trademarks.

59.     The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

**COUNT II**
**FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))**

60.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

61.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

62.     By using Plaintiffs' Trademarks in connection with the sale of Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

63.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

64.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the associated goodwill of Plaintiffs' brands.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not Plaintiffs' or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

   d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill; and

   e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any of Plaintiffs' trademarks, including the Plaintiffs' Trademarks, or any reproductions, counterfeit copies, or colorable imitations thereof;

24

2) Entry of an Order that, upon Plaintiffs' request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Wish.com, Walmart, Etsy, Temu, and DHgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiffs' Trademarks;

3) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiffs be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks;

5) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 9th day of November 2023.          Respectfully submitted,

                                              /s/ Justin R. Gaudio
                                              Amy C. Ziegler
                                              Justin R. Gaudio
                                              Justin T. Joseph
                                              Trevor C. Talhami
                                              Greer, Burns & Crain, Ltd.
                                              300 South Wacker Drive, Suite 2500
                                              Chicago, Illinois 60606
                                              312.360.0080
                                              312.360.9315 (facsimile)
                                              aziegler@gbc.law
                                              jgaudio@gbc.law
                                              jjoseph@gbc.law
                                              ttalhami@gbc.law

                                              *Counsel for Plaintiffs Manchester United Football
                                              Club Limited, Tottenham Hotspur Limited, and The
                                              Liverpool Football Club and Athletic Grounds
                                              Limited*